(No. 19034.—

FRANK A. LUNDQUIST *et al.* Plaintiffs in Error, *vs.* FREDERICK W. IVERSON *et al.* Defendants in Error.

*Opinion filed February 20, 1929.*

WILLIAM N. BRADY, for plaintiffs in error.

M. V. MINAHAN, and F. MAINS, for defendants in error.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiffs in error, Frank A. and Ann M. Lundquist, filed a bill in the superior court of Cook county against defendants in error, Frederick W. and Ellen N. Iverson, to remove from the records as a cloud on their title to real estate a certain affidavit filed by Iverson. The bill alleges that plaintiffs in error about September 1, 1921, purchased for $12,500 the premises known in the record as 5455 Winthrop avenue, in Chicago; that the property is improved by a brick residence and garage; that on December 7, 1922, Iverson filed in the recorder's office the affidavit in question here, by which he claimed to have furnished a portion of

the purchase price; that the affidavit sets out that Iverson owns a one-half interest in the property by agreement of the parties made at the time the same was purchased; that negotiations had taken place between the parties looking to the formation of a partnership for the practice of osteopathy by the Iversons and the purchase of the property as a home both for the Lundquists and the Iversons, who are related, and to develop a patent appliance to be used by the Iversons in giving treatments, and that plaintiffs in error, believing such negotiations would result in a contract of partnership, permitted defendants in error to take possession of all of the premises except three rooms and the garage, which were occupied by plaintiffs in error; that the negotiations for a partnership failed and defendants in error refused to pay rent; that plaintiffs in error expended about $3000 in time and money in improvements on the property and have made payments on the principal and interest of certain mortgages thereon; that plaintiffs in error received from defendants in error the sum of $2500 and Lundquist gave his promissory notes therefor, with the understanding that when the partnership was formed the notes would be surrendered as part payment of the purchase price of the premises; that this money was received shortly after the purchase of the property by plaintiffs in error; that on December 6, 1922, they received from defendants in error an additional sum of $500 on an uncompleted contract for the purchase of a one-half interest in the real estate and not in furtherance of the formation of the partnership. The bill prays that the affidavit be removed as a cloud on the title; that plaintiffs in error be awarded damages by reason of the recording of the affidavit; that defendants in error be required to account for a reasonable rental from September 1, 1921, for the period in which they were in possession of the greater portion of the property; that in case the court finds the Iversons have an interest in the premises, that partition of the property be had; that

if the court finds that a partnership existed, an accounting of the Iversons' business be had, and that Iverson be decreed to assign a one-half interest in certain patents.

The answer to the bill by defendants in error alleges that they had been engaged on the west side of Chicago in the profession of giving treatments for human ills without drugs; that they had a lucrative practice and that Lundquist proposed a partnership for the purpose of developing a certain mechanical table to be used in the practice conducted by the Iversons; that by the terms of the partnership Lundquist was to put in $12,000 and Iverson to put in $3000 in cash, the practice and good will of the business at $5000, and an additional $4000 in cash to be loaned by Lundquist; that the Iversons were to carry on the practice and both parties were to perfect and manufacture implements and appliances; that the interests of the parties were to be one-half each; that a prospective location was decided upon on the west side of Chicago, but that at Lundquist's request a location was secured on the north side, at 5455 Winthrop avenue; that Iverson entered into a contract for the purchase of that property and paid the sum of $500 thereon; that the purchase price was to be $12,-500—$500 cash, a mortgage of $3500, and further cash payments of $4000, with a second mortgage for $3500; that after the contract had been made Lundquist secured an assignment of the contract to himself and made the purchase of the property; that the assignment was secured by representing that there were many papers to be signed and it would be better for him to close the deal.

The cross-bill of defendants in error alleges that the Lundquists closed the deal, taking the property in joint tenancy, and signed the notes and mortgages and paid the sum of $4500 in cash; that the Iversons moved into the premises on September 8, 1921, and the Lundquists moved in on October 1, 1921; that the parties remodeled the place; that each party had two rooms on the second floor and one

on the third floor for living space; that the basement was occupied jointly as a kitchen and dining room and the garage was occupied by Lundquist as a workshop, the balance of the house being remodeled as treatment rooms used by the Iversons in their profession; that shortly after taking possession Iverson paid to Lundquist sums of money, including what Iverson had paid in advance on the contract of purchase, totaling $2500; that Lundquist stated he would have a contract written up, but he did not do so; that notes were given for $2500, which were to act as receipts, to be delivered up and canceled when a written agreement of partnership was executed; that on December 6, 1922, $500 more money was given, for which a receipt was taken by Iverson; that the parties worked under the partnership agreement until December 10, 1921, when Lundquist became angry and refused to go further, and Iverson on December 7, 1922, filed the affidavit involved here; that on January 22, 1923, the parties met, with their attorneys, to adjust their rights, and they arrived at an agreement, which was put in writing, but Lundquist later refused to carry out the agreement; that the Lundquists agreed to waive any profits in the business to be conducted by the Iversons until the Iversons had paid for one-half of the property, and that the Iversons should have a drawing account for expenses of $200 per month. The cross-bill prays that the partnership be declared and dissolved; that an accounting be had and that the rights of the Iversons in the real estate be decreed, and that Lundquist be restrained from further proceeding with any patents.

The Lundquists answered the cross-bill. They denied that the parties moved to the north side of Chicago at their request; denied that they were to waive profits in the business for three years; averred that they agreed to allow $200 per month to the Iversons only after the parties had moved into the Winthrop avenue property, and that they so agreed in their efforts to get the Iversons to

complete a partnership contract; alleged that Lundquist took over the contract for the property made by Iverson and paid the purchase money by agreement with him in order to avoid loss of the amount which Iverson had paid, for the reason that Iverson stated that he did not feel that he could complete the contract; denied that there was a completion of the partnership agreement but that what was done by the parties was in anticipation that such a partnership agreement would be made, but that they were unable to agree; that notes were given by Lundquist for the $2500 advanced by Iverson because of the understanding between the parties that if the partnership contract was not entered into the money was to be returned; alleged that Iverson finally expressed himself as unwilling to enter into a partnership with a layman as to profits of his profession. The answer also denied that the parties were to engage in the manufacture of implements and appliances.

The cause was referred to the master in chancery, who found that a partnership existed and recommended that a dissolution thereof be had and an accounting be taken between the parties. A receiver was appointed and the master's report was approved by the chancellor.

Plaintiffs in error contend that the evidence shows that no partnership existed; that an attempt was made to enter into a partnership agreement and transactions were had looking toward that end, but that no agreement was made.

Defendants in error raise a question of jurisdiction, which it is necessary to first consider. They contend this court is without jurisdiction because it was claimed by them and found by the chancellor that the real estate involved was for the use and benefit of a co-partnership; that such real estate is to be treated as personal property, and therefore no freehold is involved. Plaintiffs in error contend that the property belongs to them, alone, subject to the right of the Iversons to a one-half interest therein upon payment of their share of the purchase price; that there

is and was no contract of partnership. A freehold is involved in all cases where the necessary result of the judgment or decree is that one party gains and another loses a freehold estate, or where the title to a freehold is so put in issue by the pleadings that the decision of the case necessarily involves a decision of such issue even though the judgment or decree did not result in one party gaining and another losing a freehold estate. (*Lederer* v. *Rosenston,* 329 Ill. 89; *Hibernian Banking Ass'n* v. *Commercial Nat. Bank,* 157 id. 576; *Sanford* v. *Kane,* 127 id. 591; *Wing* v. *Sherrer,* 77 id. 200.) The bill in this case is to remove as a cloud from complainants' fee simple title a certain affidavit, in which it is claimed that affiant owns a one-half interest in the premises. Complainants' title is by this allegation directly put in issue. Defendants' position depends largely on whether there was a contract for partnership. To hold that no fee was involved because the chancellor found that a partnership existed is to decide the principal issue in the case in order to determine whether the court had jurisdiction. This we will not do. Jurisdiction of this review lies in this court.

As stated, the principal question involved is whether a partnership agreement was proved on this record. That it was the purpose of the parties to enter into a partnership is conceded. That transactions were had between them looking toward such an arrangement is evident, but an issue is raised by the bill and cross-bill as to the terms of the agreement. The parties are related, and it is evident that ordinary care was not used on either side to determine, before purchasing property, whether they could agree on a partnership arrangement. Lundquist testified that negotiations were started looking toward a partnership; that they looked at a number of different pieces of property; that finally the premises at 5455 Winthrop avenue were satisfactory to the Iversons, and Iverson entered into a contract for the purchase thereof at $12,500 and paid down the sum

of $500; that he afterwards stated that he felt he could not complete the purchase of the property himself, and it was agreed that witness should take an assignment of the contract and complete the purchase; that he received $2500 from Iverson and gave his notes for the same, which amount included the sum of $500 which had been paid by Iverson on the contract; that at different times they made improvements on the property; that witness spent between $1500 and $1700 between September 1, 1921, and March, 1922, in re-arranging the house for the purposes of the practice of the Iversons' profession; that he also paid the principal of the second mortgage as it came due and the interest on the first mortgage, as well as the taxes and insurance charges; that he had many conversations with the Iversons in an endeavor to complete a partnership arrangement, but on each occasion Mrs. Iverson would bring up some proposition which would prevent further consideration of the contract; that the parties met, with their attorneys, in January, 1923, and agreed on a certain contract, by which Iverson was to quit-claim the interest which he claimed under his affidavit filed of record, in order to permit the renewal of a mortgage then due against the premises; that the Iversons by that agreement were to pay the amount then found to be due from them for a one-half interest in the property, upon which payment they were to have a deed for such interest; that this agreement, when reduced to writing, was turned over to the Iversons with the request that they sign it; that they took the copies of the contract, and witness was later informed by Iverson that he had been advised by his counsel not to sign anything if he didn't know what he was doing, and if he didn't know what he was doing he better leave it alone; that witness told the Iversons that they had to get the matter straightened out or the mortgage would be foreclosed, and Iverson replied that it was not his worry. Mrs. Iverson refused to sign the contract.

Iverson testified that there was a contract for a partnership; that they were to form a partnership for the practice of osteopathy by the Iversons and the development of certain patents; that the total capital of the partnership was to be $24,000; that the Lundquists were to put in $12,000 in cash; that the Iversons were to put in $3000 in cash, the assets and good will of their practice at $5000 and their promissory note to Lundquist of $4000; that removal to the North Side was at the request of Lundquist; that they were willing to enter into such a contract but that the Lundquists refused to do so. He contends that from the start the agreement was not only that the $5000 represented by good will was to be put in as cash but that the Iversons were to have an expense account of $200 per month, and Lundquist was not to have any income from the property or business until each had come to an equal amount in the payments on the real estate; that the net annual income above $2400 was to be applied to his account on the real estate until he had reached an equal share with Lundquist. Witness states that in January, 1923, the parties met, with their attorneys, and an agreement was made, which was to be reduced to writing, by which it was provided that the Iversons would give the Lundquists a quit-claim deed so that the mortgage could be straightened out; that witness had the deed made and signed but they did not acknowledge or deliver it; that witness did not give it to Lundquist, who asked for it a number of times and told him that he had to have the quit-claim deed because he could not place a mortgage on the property without it; that they did not give Lundquist a signed copy of the agreement entered into at that time; that Mrs. Iverson did not sign any of the agreements; that the income from the practice in January, 1922, amounted to $200 per month and by March, 1923, had risen to $600 per month; that on December 6, 1922, the last $500 was turned over by witness to Lundquist, and a receipt, identified in the record as "Ex-

hibit 3" and which will be later herein considered, was given him; that when "Exhibit 3" was executed and the money paid the business was not considered at all but the receipt was given to determine a settlement; that after December, 1921, witness treated the business as his own and never gave an accounting.

Mrs. Iverson testified substantially as her husband, except that she stated that she had been opposed to a professional man entering into a contract with a layman; that she did not believe it could be done, and that such was her opinion at the time of the trial. She was asked to state what was objectionable in the contracts that were drawn in January, 1923. She replied that possibly the obligations were not well enough outlined or specified, and when pressed for an answer as to what obligations she meant, she replied, "Well, the obligations of the two different parties to the agreement."

All the parties testified that a memorandum was made in the handwriting of Lundquist concerning the formation of a partnership with a total capitalization of $24,000. Lundquist testified that he made this memorandum shortly after the first of July, 1921, at the time they were looking at property on the West Side, which would have involved an expenditure of about $30,000, and that it was made in an endeavor to determine what would be necessary at that time to purchase that property. The Iversons testified this memorandum was made after they had purchased the Winthrop avenue property, or about September 1. No reason is shown for a $24,000 capitalization for the purchase of property costing but $12,500, at least one-half of which was represented by mortgages. The memorandum carries the notation, "Interest equal in all things." Nothing appears in the memorandum as to Lundquist waiving interest in the business for any period of time or allowing an expense account of $200 per month to the Iversons. It seems more reasonable to believe that this memorandum was made when

they were considering the West Side property, which would cost a much larger sum of money. Both Lundquist and Mrs. Iverson testified that a number of such memoranda were made in an effort to arrive at a basis upon which the partnership contract could be made. This memorandum carries also the item of contribution by the Iversons of "assets and good will, $5000," which Iverson testified was to represent cash. There is no showing as to what the assets were, and Iverson testified that he had no business on the North Side but did have on the West Side. We are of the opinion that the memorandum was made when the parties were considering remaining on the West Side.

It is evident from the testimony of the parties that no contract of partnership was completed but that each had proceeded on the theory that they would agree as to a partnership. The agreement which was drawn as a result of the conference between the parties on January 22, 1923, related entirely to the real estate. It is evident that neither of the parties considered there was a contract of partnership in force at that time. It sets out that it was understood at the time of taking title to the real estate, that Iverson and his wife should take and pay for an undivided one-half of that property; that Lundquist had advanced and paid on account of the purchase price and all running expenses since the purchase, taxes, interest, insurance, improvements and alterations, the sum of $7319.04; that the Iversons had contributed in cash paid to Lundquist, and for expenses in and about improvements, fuel, etc., the sum of $3464.06, making a total of $10,783.10; that in order to equalize the outlay of expenses between the parties the Iversons should contribute the sum of $1927.49, and the manner of that payment was specified. An option was to be given the Iversons to purchase the real estate during the month of May, 1924, subject to encumbrances aggregating $7000, for the sum of $4500, on condition that the Iversons had made payments of $1927.49. It was stated in the agree-

ment that it was understood that the Iversons had executed a quit-claim deed to the Lundquists for the purpose of completing a loan of $6000 on the real estate, and that while the deed had been delivered yet the interest of the Iversons was to remain as stated in that contract. Other provisions appear in the agreement as to the equalization of rent. It is also stated therein that the notes given by Lundquist to Iverson, amounting to $2500, were to be treated as sums paid in, as set out in that contract. The contract was not signed. On December 6, 1922, the last payment was made by Iverson to Lundquist in the sum of $500, for which the following receipt was given:

"Received of F. W. Iverson five hundred dollars ($500) in addition to two thousand five hundred ($2500) previously received against two notes, one note for one thousand dollars ($1000) and one note for one thousand five hundred ($1500) to be applied on his half interest in the property, located at 5455 Winthrop avenue.

"The above one-half interest in said property is based on the original purchase, plus costs incurred by remodeling and re-finishing the main building.

"This instrument is preliminary to the detailed contract specifying all items pertaining to the above purchase.

FRANK A. LUNDQUIST."

It is evident that this receipt represents payments amounting to $3000 toward the purchase of one-half of this property. It is stated that the instrument is preliminary to a complete contract specifying all items pertaining to the above purchase. The receipt is, in effect, a contract concerning the purchase of a one-half interest in the property by the Iversons, and it is evident, as stated by Iverson in his testimony, that the real estate was the only subject matter remaining under consideration between them at that time. He testified that the business was not then considered. It seems clear from this receipt, from the contract which was agreed upon in the office of the attorneys for the parties but which was not signed or delivered by the Iversons, and from other evidence herein discussed, that a partner-

ship contract was never completed between these parties. It was error on the part of the chancellor to find that such contract existed.

It is also clear that the Iversons have a right to a one-half interest in the real estate provided they pay a sum amounting to one-half of the original purchase price, plus cost of the improvements incurred by remodeling and re-finishing the building, as set out in the receipt of December 6, 1922.

It is apparent that for a considerable time both parties were occupying these premises, and an accounting should be had between them for the reasonable value of the parts of the premises used by each, and contribution to improve-ments, taxes, etc., by each. Upon payment by the Iversons of the sum found due on such accounting, within a reason-able time to be fixed by the chancellor, the Lundquists shall be decreed to deed to the Iversons, in joint tenancy, a one-half interest in the premises, and upon failure, within such time as fixed by the chancellor, to make such payments the chancellor shall decree partition of the premises in accord-ance with the interest of each therein as shown by such ac-counting. The receiver appointed, if it has collected rents from the property, shall continue until an accounting is had and until further order of the chancellor.

The cross-bill seeks an injunction against Lundquist re-straining him from acting in any capacity concerning cer-tain patents. There is not, however, either in the allegations of the cross-bill or in the evidence, sufficient averment or proof to justify a decree pertaining to those matters but as to them the parties should be left to pursue their remedy in a separate action, if any they have.

The decree is reversed and the cause remanded to the superior court, with directions to enter a decree in accord-ance with the views herein expressed.

*Reversed and remanded, with directions.*